**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **ROBERT W. GRIFFITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Cause No. 1:07-cv-1427-WTL-TAB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## Entry Remanding to Commissioner

Plaintiff Robert W. Griffith brings this action under 42 U.S.C. § 405(g) seeking review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his application for disability insurance benefits. Acting for the Commissioner, an administrative law judge ("ALJ") found on April 19, 2007, that Mr. Griffith was not disabled and denied his claim for benefits. The Appeals Council later denied Plaintiff's request for review. For the reasons explained below, this Court remands this matter to the Commissioner.

### Mr. Griffith's Background and Relevant History

When Mr. Griffith filed his application for benefits on October 23, 2003, he was 51 years of age and claimed his disability began on September 30, 2002, from a concussion and depression that occurred after a motor vehicle accident.

Mr. Griffith visited his family physician, Dr. Daniel Shull, shortly after the accident. He complained of having been very stressed and emotional since the accident. Dr. Shull ordered an x-ray of his right shoulder and an MRI of his head, which both were negative for any problems. Mr. Griffith seemed hypomanic, so Dr. Shull prescribed medication for stress.

In February 2003, Mr. Griffith again visited Dr. Shull to discuss medication, and he observed that Mr. Griffith presented as hypomanic to manic.  Mr. Griffith reported that he had considerable trouble sleeping, so Dr. Shull started him on sleeping medication.

In September, Mr. Griffith visited Dr. Shull's office to express concern that the medications he was taking might cause diabetes, but the nurse assured him that was not true.  He also complained to Dr. Shull of stiffness in his neck, some lightheadedness, and significant right paracervical pain that he attributed to the crash a year earlier.  Dr. Shull did not find any reason to believe these problems would persist.

In early November 2003, Mr. Griffith went to an emergency room for intermittent neck pain that was worsening; the pain traveled from his head to his right shoulder.  He was diagnosed with a cervical strain and discharged.

On November 15, 2003, Dr. Quadeer examined Mr. Griffith for head injury, depression, and right shoulder pain.  Mr. Griffith reported that the head injury and depression prevented him from having a restful sleep and this caused generalized fatigue.  He reported some suicidal tendencies, but had not had any recently, and he occasionally drank alcohol.  He stated that he had not seen a psychiatrist, and Dr. Quadeer recommended that he see one.  He claimed that he had significant shoulder pain after his accident and that made it hard to raise his right arm over his shoulder.  Dr. Quadeer found that Mr. Griffith had some problems with activities of daily living, but those problems were related to his shoulder injury.  Mr. Griffith had no problems understanding or concentrating and "appear[ed] to have normal social interaction skills."

Mr. Griffith appeared for his psychological evaluation on November 21, 2003, with Rosalind Schmutte, Psy.D., after Disability Determination Services (DDS) had referred him.  He reported that he had started to remember traumatic events since his accident and that he had

become tearful some days.  He rated his sleep patterns as "fair" and his eating as "ok."  He classified his mood as ready to "explode…it's an angry feeling."  He said that he had felt intermittent head, neck, and shoulder pain since the accident.  He stopped taking medications for his mood because of their sedative side effect.  He drove his daughter to school and coached her softball team, but he felt his symptoms affected his relationship with her.  He still drank once a week and consumed about four beers at a time.  He had "a few friends," was able to care for himself, and did laundry and cooked.  He rode his bike for an hour three to five days a week.

Dr. Schmutte observed that his mood was depressed and that he had difficulty staying on a regular sleep schedule.  She rated his insight and judgment as poor and his intellect as average.  He had no treatment for depression other than having started medications that he had stopped taking because of their sedative side effect.  He did not have any intent to harm himself.  He was alert and oriented to person, place, time, and situation, but he did appear anxious and tearful.  He had no problem with tasks assessing his attention and concentration, general information, judgment, and abstract thinking, but he seemed to have some impairment in social or occupational functioning.  He reported that he has had problems with mood all of his life, but that these problems had gotten worse since his accident.  Dr. Schmutte found that Mr. Griffith had a Global Assessment of Functioning ("GAF") score of 48.

DDS psychologists and physicians conducted a mental residual functional capacity ("RFC") assessment and psychiatric review technique of Mr. Griffith on December 8, 2003.  He was assessed for Listings 12.04 (Affective Disorders) and 12.09 (Substance Addiction Disorders) and found to have Major Depressive Disorder, Recurrent, Severe; the doctors concluded that this impairment did not satisfy diagnostic criteria and that he could perform simple, repetitive tasks.

3

A physical RFC assessment on February 25, 2004, found that Mr. Griffith could occasionally lift 20 pounds, frequently lift 10 pounds, was unlimited in pushing/pulling, and that he had no postural, manipulative, communicative, environmental, or visual limitations.

During an examination by Dr. Shull on November 16, 2004, Mr. Griffith again said he was not taking his psychotropic drugs because of concerns they would cause diabetes, but he was regularly taking Cialis.  Dr. Shull thought he might be bipolar.  He confirmed his diagnosis of bipolar disorder when he saw him on April 15, 2005, and Dr. Shull recommended a mood stabilizer, but Mr. Griffith refused to take it.

At the administrative hearing on July 24, 2006, Dr. Jack Thomas testified that a review of Mr. Griffith's records suggested that he was not compliant in taking psychiatric medication and that he abused alcohol.  That was significant because any alcohol would have aggravated a mood disorder, even if he had used it only once a week.  Mr. Griffith had reported that he was drinking during the time of the 2003 and 2004 psychological assessments.  Dr. Thomas doubted the assessment of a GAF of 48, because Mr. Griffith should have been institutionalized if that had been true.  Dr. Thomas concluded that there was no evidence in the record to suggest that Mr. Griffith had a psychological condition that had lasted twelve consecutive months.  Only the April 15, 2005, assessment indicated that he was taking his prescribed medication.

The second medical expert at the hearing was Dr. Arthur Lorber, who testified that Mr. Griffith did not have any physical impairments that made him disabled.  Dr. Lorber noted that a November 15, 2003 examination had found that he had normal gait and some diminished range of motion of the right shoulder that seemed volitional.  After an examination a year later, Dr. Shull concluded, "[C]ertainly physically he is quite healthy." Dr. Lorber reasoned that any

limitation Mr. Griffith had in his right shoulder in 2003 had been resolved by the time of the 2004 examination.

The vocational expert ("VE") testified that Mr. Griffith could meet the physical demands of his past job, but that he would probably not be able to concentrate on that work with the depression he described.  The VE did not state whether significant numbers of jobs existed in the national economy for someone with Mr. Griffith's impairments.

At the conclusion of the evidence, the ALJ told Mr. Griffith's counsel that he was going to find him not disabled because there was not sufficient evidence to demonstrate a disability that had lasted twelve consecutive months.  The ALJ did believe that Mr. Griffith had some impairments, but not to the extent that he was disabled.  The ALJ decided to send Mr. Griffith for another assessment to determine whether Mr. Griffith suffered from any long-term disability.

On September 26, 2006, Nancy Ingwell, Ph.D., conducted Mr. Griffith's post-hearing psychological examination and medical assessment of mental ability to do work-related activities.  Mr. Griffith told her that he could not work because he did not feel well, could not get up, and could not function because he was tired and remembered his past.  He claimed that this caused him anxiety attacks.  He had gone on a real estate sales showing to see if he could work again, and he said that experience made him feel as if he were on the edge of a cliff ready to jump off.  He reported that he had lost 25 pounds in the past eighteen months because his appetite was not good.  He had had thoughts of suicide in the past, and his mood was depressed.  Dr. Ingwell found that his impairment was Major Depression, Recurrent, Severe, and that he had a GAF of 55.  She found that he could not tolerate contacts with the general public or coworkers, but that he could respond appropriately to supervision and structure a daily routine for himself.

The ALJ reviewed Dr. Ingwell's report, and after considering it with other evidence in the record, denied Mr. Griffith's application on April 19, 2007.

## Analysis

**Standard of Review**

The ALJ's findings of fact are conclusive and must be upheld "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *id.*, and a court may not reweigh the evidence or substitute its judgment for that of the ALJ. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). The ALJ is required to articulate only a minimal, but legitimate, justification for his acceptance or rejection of specific evidence of disability. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004).

Disability is defined as "the inability to engage in any substantial gainful activity by reason of a medically determinable mental or physical impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of at least twelve months." 42 U.S.C. § 423 (d)(1)(A). In order to be found disabled, a claimant must demonstrate that her physical or mental limitations prevent her from doing not only her previous work, but any other kind of gainful employment that exists in the national economy, considering her age, education, and work experience. *Id*. at § 423(d)(2)(A).

In determining whether a claimant is disabled, the agency applies a five-step sequential analysis: 1) is the claimant presently unemployed; 2) is the claimant's impairment or combination of impairments severe; 3) does the impairment meet or exceed any of the list of specific impairments that the Secretary acknowledges to be so severe as to preclude substantial

gainful activity; 4) if the impairment is not specifically listed, is the claimant able to perform his former occupation; and, 5) if the claimant cannot perform his past work, is the claimant unable to perform other work in the national economy in light of age, education, and work experience.  20 C.F.R. §404.1520.  Except for step three, a negative finding at any step precludes a finding of disability.  *Young v. Secretary of Health and Human Services*, 957 F.2d 386, 389 (7th Cir. 1992). If the answer is affirmative at steps one, two, or four, the reviewer proceeds to the next step.  *Id*. An affirmative answer at steps three or five results in a finding of disability.  *Id*.

When an ALJ recommends that the agency deny benefits, he must first "build an accurate and logical bridge from the evidence to the conclusion."  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  In other words, the ALJ must rest his denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade.  *Id*.

**ALJ's Findings and Plaintiff's Contentions**

For step one, the ALJ found that Mr. Griffith had not engaged in substantial work activity since his alleged onset date of September 30, 2002.  At step two, the ALJ determined that Mr. Griffith suffered from right shoulder dysfunction, residual effects of a concussion, depression, and alcohol abuse.  The ALJ, however, did not find that Mr. Griffith had an impairment or combination of impairments that met or medically equaled one of the Listings for step three. The ALJ considered and rejected a finding of impairment under Listings 1.02 (major dysfunction of a joint), 12.04 (affective disorders), and 12.09 (substance addiction disorders).  At step four, the ALJ found that Mr. Griffith could not perform his past work as a real estate agent, but found for step five that significant numbers of jobs in the national economy existed that he could perform.  Based on this analysis, the ALJ found that Mr. Griffith was not disabled.

Mr. Griffith challenges the ALJ's finding on five grounds: (1) the ALJ ignored critical evidence in formulating the RFC; (2) the ALJ failed to adequately execute the duty to shift the burden of proof at step five of the sequential analysis; (3) the decision erroneously determined that Mr. Griffith is capable of working in the national economy; (4) the decision erroneously concluded that Mr. Griffith is capable of work based on his daily physical activities and purported gaps in treatment; and, (5) the ALJ failed to properly analyze and take into consideration Mr. Griffith's complaints of headaches. The Court reorganizes and rephrases those arguments to raise the following issues: (1) whether the ALJ considered and evaluated all evidence that supported a finding of disability or ignored evidence that contradicted his conclusion (Issues 1, 4, and 5); (2) whether the ALJ applied the correct burden and standard of proof for step 5 (Issue 2); and, (3) whether sufficient evidence supported the finding that Mr. Griffith was capable of working in the national economy (Issue 3). Each of these issues is addressed, in turn, below.

**1. The ALJ properly considered all relevant evidence and did not ignore evidence that contradicted his conclusion.**

Mr. Griffith claims that the ALJ ignored medical evidence that would support a finding of disability. Specifically, he asserts that the ALJ ignored: (a) psychological evaluations, and (b) headache complaints.

An ALJ must consider "*all* relevant evidence" and may not analyze only that information that supports his final conclusion. *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000) (quoting *Clifford*, 227 F.3d at 871). The ALJ, however, "need not evaluate in writing every single piece of evidence in the record." *Zalewski v. Heckler*, 760 F.2d 160, 166 (7th Cir. 1985). As long as he has not ignored an "entire line of evidence," he need only "articulate, at some minimum level,

his analysis of the evidence to allow the reviewing courts to trace the path of his reasoning."

*Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

### a.  ALJ's evaluation of psychological evidence

Mr. Griffith argues that the ALJ ignored psychological evidence that would support a finding of disability.  For Mr. Griffith's RFC, the ALJ concluded:

> [T]he claimant has the residual functional capacity to perform nearly a full range of light work as follows:  lifting or carrying 10 pounds frequently; lifting or carrying 20 pounds occasionally; standing or walking, off and on, for six (6) hours during an eight (8) hour day; intermittent sitting; and using hands and arms for grasping, holding, and turning objects; with the only limitation being occasional climbing of ladders, ropes and scaffolds; and the work must be simple and repetitive, akin to unskilled work.

Mr. Griffith's argument is founded on the perceived conflict between the ALJ adopting the GAF of 55 from Dr. Ingwell's October 2006 assessment while discounting Dr. Ingwell's conclusion from the same report that Mr. Griffith was not capable of tolerating normal work activities.  Mr. Griffith's claim that the ALJ did not even consider Dr. Ingwell's assessment that he lacks the ability to sustain work is without merit, because the ALJ did, in fact, recite Dr. Ingwell's finding that the claimant would have difficulty sustaining work.  The ALJ reached a conclusion different from Dr. Ingwell's findings based on Mr. Griffith's improvement of the GAF score from 48 to 55, and on the testimony of Dr. Thomas that Mr. Griffith's activities of daily living and gaps in the record indicate he may have been asymptomatic with the proper medication and treatment, so that he would not have had a disability that lasted 12 months.

Further, other evidence directly conflicted with Dr. Ingwell's assessment that Mr. Griffith was not able to tolerate normal work activities.  Reviewing psychologist Dr. Kladder assessed Mr. Griffith as having only mild restrictions in daily living activities or social function, with

moderate difficulties of concentration.  Dr. Quadeer, a consulting physician, observed that Mr. Griffith had normal interaction skills and no problems understanding or concentrating.

In addition, Dr. Thomas testified that any finding that Mr. Griffith had a severe mental impairment was inconclusive.  He explained that a person who was not taking prescribed medicines and was self-medicating with alcohol would have had symptoms of a mental impairment that could have been remedied in two to three months if the person would have followed a prescribed course of treatment; he indicated that Mr. Griffith was such a person and that further evaluation would be required.

In addition, the ALJ analyzed other psychological evidence that did not support his conclusion.  The first consultative examination, in November 2003, by Rosalind Schmutte, Ph.D., assigned Mr. Griffith a GAF score of 48, which indicates severe symptoms such as suicidal ideation, severe obsession, or a serious impairment in social, occupational, or school functioning.  Dr. Schmutte, however, noted that Plaintiff lived with his daughter, cared for her, had "a few friends," and coached his daughter's softball team.  Additionally, Dr. Thomas indicated that a reasonable course of treatment for someone with such a low GAF score would be commitment.  ALJs have the discretion to discount medical evidence if it is internally inconsistent or inconsistent with other evidence.  *See Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).  The ALJ said that he viewed Dr. Schmutte's assessment with suspicion because Mr. Griffith's symptoms did not match her assessment or any course of treatment.

Mr. Griffith's argument that his lack of evidence of a psychiatric disorder could be explained by his financial condition is not supported by the record.  Mr. Griffith did receive much medical care after his car accident, but there is no indication that he ever sought

psychiatric treatment.  Further, Dr. Thomas testified that Mr. Griffith did not comply with instructions from mental health providers and that he self-medicated.

The ALJ analyzed all relevant psychological evidence, and the ALJ explained why he credited some evidence while discounting other evidence.  The Court finds that the ALJ did not ignore evidence contrary to his ruling.

### b. ALJ's rejection of headache complaints

Mr. Griffith also contends that the ALJ erred by not considering his headache complaints. When Mr. Griffith listed his medical complaints in support of his application for disability benefits on November 4, 2003, he wrote that he had had headaches daily since his car accident. He further declared that these headaches caused blurred vision and sensitivity to noise and light. He noted these headaches again when he filed for reconsideration of the Commissioner's denial.

Mr. Griffith cites two evaluations that mention his headache complaint.  The first is the physical examination completed by Dr. Quadeer.  Nowhere in the evaluation does it state that Mr. Griffith was then complaining of headaches.  The only mention of headaches in the entire three-page evaluation is under "PAST MEDICAL HISTORY."  This description of the timing of the headaches undercuts, rather than supports, Mr. Griffith's argument that the ALJ failed to consider a relevant piece of evidence.  Because Mr. Griffith had reported that headaches had bothered him in the past, the logical inference is that they either did not continue to bother him or had decreased in intensity by the time Dr. Quadeer evaluated him.

The second evaluation Mr. Griffith cites is the psychological evaluation by Northwest Psychological Associates, LLC.  The only mention of any pain complaints related to his head is a reference to a report of "pain in his head, neck, and shoulders."  No other reference to pain that could be characterized as a headache is made in the entire eight-page report.

11

These are the only mentions of Mr. Griffith's headaches despite many visits to his physician and other health professionals.  The record does not support Mr. Griffith's claim that the ALJ failed to consider a relevant piece of evidence because Mr. Griffith did not demonstrate in the evidence or testimony the extent of headaches or any effect on his functioning.  The ALJ was not required to evaluate a symptom that was mentioned only in his application for Social Security benefits and once in a psychologist's notes.

The evidence of headache complaints was scarce and insignificant relative to the scope of Mr. Griffith's medical history and other alleged impairments.  The ALJ was not required to evaluate headache complaints merely because they were noted on the disability benefits application and mentioned once in a psychological evaluation.  The ALJ did not err by not analyzing Mr. Griffith's headache complaints.

**2.    The ALJ correctly shifted the burden of proof for step five.**

Mr. Griffith had the burden to show that he was disabled through step four of the five-step sequential disability analysis.  *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).  At step five, the burden shifted to the Commissioner.  *Id.*

Mr. Griffith argues that, "The ALJ's conduct would make it appear that he applied a much stricter, almost criminal justice level standard, regarding the claimant's burden of proof." Mr. Griffith does not specify what analysis demonstrates application of a higher burden of proof for his case.  Instead, he conclusorily asserts that the ALJ "obstructed the free flow of information and prevented the claimant and his attorney from conveying the evidence in a light most favorable to the claimant."  Although it is true that the ALJ interrupted the VE's response to a question with a question of his own, Mr. Griffith's counsel did not object to the ALJ doing so, and the ALJ did not prevent counsel from asking for a response or repeating the question.

The Court's review of the record does not reveal that the ALJ applied a higher standard of proof or that he obstructed Mr. Griffith's counsel from presenting facts supporting a claim of disability or developing any argument.  To the contrary, the ALJ made a vocational expert available and even requested an additional psychological evaluation for Mr. Griffith after the ALJ had determined that the evidence at the hearing was not sufficient to find that he was disabled.  At no time did Mr. Griffith's counsel object to the evidence or to any actions of the ALJ.  The record indicates that the ALJ fulfilled his duties to develop the record and allow adequate examination or cross-examination.  The ALJ applied the correct burden of proof at step five of the disability analysis.

3. **This case must be remanded because the finding that Mr. Griffith was capable of working in the national economy was not supported by sufficient evidence.**

Mr. Griffith argues that the ALJ erred by not receiving sufficient vocational expert testimony so that his decision was based only on the Medical-Vocational Guidelines (commonly known as "grids").  The ALJ found that a sufficient number of jobs existed in the national economy based on applying Mr. Griffith's RFC to the grids.

Functional limitations that affect the ability to meet the strength demands of jobs are classified as exertional.  20 CFR § 404.1569a(a).  Functional limitations that affect the ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional.  *Id.*  Where a nonexertional limitation might substantially reduce the range of work an individual can perform, use of the grids is inappropriate and the ALJ must consult a VE.  *Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

In this case, the ALJ found that Mr. Griffith had "the residual functional capacity to perform nearly a full range of light work . . . with the only limitation being occasional climbing

13

of ladders, ropes and scaffolds, and the work must be simple and repetitive, akin to unskilled work." The requirement of simple and repetitive work is a nonexertional limitation— presumably based upon the ALJ's finding that Mr. Griffith had a GAF of 55, which indicated moderate difficulty in social and occupational functioning--which made it improper for the ALJ to rely upon the grids, which "generally take account only of exertional impairments." *Fast*, 397 F.3d at 479. Therefore, the testimony of a VE was required in order to determine whether there were sufficient jobs in the "light" category that would accommodate the need for simple and repetitive work (as well as the need to only occasionally climb ladders, ropes and scaffolds).

The ALJ did call a VE in this case who testified at the hearing. When Mr. Griffith's counsel began to ask the VE whether jobs existed in significant numbers in the national economy for someone with Mr. Griffith's impairments, the ALJ interrupted the question to clarify the VE's response to an earlier question. After the VE clarified his earlier response, Mr. Griffith's counsel stated that he had no further questions without finishing the interrupted question.

Although the ALJ did call a VE to testify in this case, the VE did not offer any testimony to support the ALJ's conclusion that significant numbers of jobs exist in the national economy for someone with Mr. Griffith's impairments. The VE did not offer any relevant testimony or evidence to support the ALJ's step five determination. The ALJ's written findings make clear that he consulted only the grids in his finding. Although the ALJ did not prevent Mr. Griffith's counsel from re-asking his question whether significant numbers of jobs existed for Mr. Griffith, the ALJ still has the obligation to base his determination only on the evidence in the record, and in any event it is the Secretary, not the claimant, who has the burden of proof at step five. Because the record is devoid of any evidence regarding the number of jobs that a person with Mr. Griffith's residual functional capacity could do, and the finding of a significant

nonexertional requirement made it improper to rely upon the grids, the ALJ's step five

determination is not based upon substantial evidence and remand is required.

## Conclusion

For the foregoing reasons, the Commissioner's decision is remanded for further

proceedings and findings consistent with this Order.

SO ORDERED:   03/12/2009


_William T Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana


Copies to:

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov,pearlie.wadlington@usdoj.gov,lin.montigney@usdoj.gov